J. S40015/15

**NON-PRECEDENTIAL DECISION – SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN RE: ADOPTION OF: X.P.D. | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| APPEAL OF: K.K., NATURAL MOTHER, | : | |
| | : | No. 128 WDA 2015 |
| Appellant | : | |

Appeal from the Order Entered December 22, 2014,
in the Court of Common Pleas of Butler County
Orphans' Court Division at No. OA No. 2011-00035a

BEFORE: FORD ELLIOTT, P.J.E., DONOHUE AND STRASSBURGER,* JJ.

MEMORANDUM BY FORD ELLIOTT, P.J.E.:          **FILED AUGUST 26, 2015**

K.K. ("Mother") appeals from the order granting the petition filed by J.R.D. ("Father"), involuntarily terminating Mother's parental rights to her son, X.P.D. ("Child"), born in 2007, pursuant to Section 2511(a)(2) and (b) of the Adoption Act, 23 Pa.C.S.A. § 2511(a)(2) and (b). We affirm.

We adopt the factual history of this matter as recounted by the trial court.

> Mother and Father never married. At the time of Child's birth, they resided together. Both consumed illegal drugs. Child was born addicted to methadone. During this time, both parents provided care for Child. When Child was three or four months old, Father left Mother who then provided all parental care for Child until her arrest on or about July 16, 2008 when Child was approximately 18 months old.
>
> Mother was purchasing stamp bags of heroin. Child was present. Mother was charged with endangering the welfare of a child, possession of a controlled substance, and distribution of a small

---

* Retired Senior Judge assigned to the Superior Court.

amount of marijuana. Mother ultimately pled guilty to all three charges.

After breaking up with Mother, Father began a process to stop his drug use. In July of 2007, Father enrolled in rehabilitation at Turning Point. He continued his plan for sobriety by attending Gateway, participating in Narcotics Anonymous for one year and participating in counseling through his church. Father has a clean date of August 9, 2007.

Following Mother's arrest, Child was temporarily placed with Maternal Grandfather. Mother remained incarcerated for approximately three weeks. Father learned of Mother's incarceration and placement of Child with Maternal Grandfather at a previously scheduled Custody Conciliation conference. Thirteen days after Mother's arrest, physical custody was then granted to Father. Father has remained the primary physical custodian of Child since.

From the date of her arrest on July 16, 2008 until the start of therapeutic visits sometime in the summer of 2011, Mother had little contact with Child, provided no parental care, and provided no financial support for Child. Father provided all parental care and emotional support for Child. Prior to 2011, Mother had a long history of drug abuse and criminal convictions for drug related matters. Mother testified she has a diagnosis of borderline personality disorder. Mother has been prescribed medication such as Klonopin and Adderall for anxiety and ADHD. It is not clear from the evidence whether Mother has officially had a mental health evaluation, nor is it clear what prescriptions, if any, Mother is currently prescribed. Mother testified that she addresses her mental health by taking medication, attending weekly therapy and attending church.

Mother spent some time in 2010 in a state correctional facility followed by a day reporting program and a half-way house. It was during this time, with Father's consent and support by Maternal

Grandfather, that Mother had limited contact with Child.

Sometime after her release from the half-way house, Mother filed for a modification of custody. Following a custody conciliation, Mother received therapeutic visits with Mr. Ken Evanoski at Family Pathways through a Court Order dated June 2, 2011. Goals were set for Mother through Family Pathways which included being consistent with visitations, being prepared with snack, games and activities for Child during visits, and being able to show she was interested in Child. From the start, Mother did very well in that she would always come to visits "prepared and provided plenty of stuff and food" for Child. She would bring train sets and a little chair every week for Child. Mother signed releases to allow Family Pathways to communicate with her probation officer and other therapists. Due to the weekly drug screens Mother was submitting through her probation officer, she did not submit to drug screens at Family Pathways. She did, however, submit weekly reports with regards to her drug screens through her probation officer. Mother was passing her weekly tests.

Mother and Child continued to visit at Family Pathways until sometime in December of 2011. Father unilaterally stopped the therapeutic visits. Father's explanation for ending the visits even though Court ordered varied from complaining that the location was inconvenient to disagreeing with the view of the therapeutic supervisor. Ken Evanoski testified that he has not been involved for more than two years with the parties, and has no knowledge of the current situation that exists.

Due to Father's refusal to take Child to Family Pathways, Mother missed some parenting time. However, Father "permitted" Mother to have parenting time at Maternal Grandfather's home instead.

Therefore, Mother and Child had regular consistent parenting time together from approximately May, 2011 until December, 2012 (18 months). Mother has not, however, had any significant parenting time with Child that was not at least monitored since prior to July 16, 2008. Mother's presence in Child's life has been sporadic as a result of her continued struggle with addiction and incarceration. In fact, Mother has not seen Child since December 18, 2012 other than for a bonding assessment session on February 17, 2014.

In December of 2012, Mother proceeded to an appointment at a Suboxone clinic in Squirrel Hill during her scheduled four-hour visit with Child. She then kept Child for an additional four days, and she knowingly and intentionally failed to advise Father of Child's whereabouts during that period of time. This incident resulted in the suspension of Mother's visiting time with Child, which is still in effect. Mother testified that she believed Child to be too ill to return to Father's care and, therefore, sought medical treatment for Child and claimed Child exhibited symptoms of a fever, a runny nose, vomiting and sore throat. The Court did not find Mother credible as to the reason she failed to timely return Child to Father's custody. Mother testified that upon being discharged from the health care provider, Mother received instructions to give Child Tylenol or ibuprofen as needed, to drink fluids, and rest. Nothing was placed on the record to confirm such medical treatment was sought. Since that incident in December of 2012, the only contact Mother has had with Child has been via telephone, the two letters Mother sent Child, and the one Mother's Day card Child sent Mother.

When the Court ordered, on or about December 17, 2012, that Mother's visitations be suspended, her contact with Child was limited to telephone contact. That Order of Court continues to be in effect due to the consented to continuation of the custody litigation under the family docket. Mother has called Child at Father's residence on a

- 4 -

regular basis since the filing of the Petition despite the fact that Father listens to every conversation on speaker phone. The comfort level of the telephone communications may have been strained due to the monitoring of the communications by Father. During the telephone conversations, Mother did not engage in meaningful conversation with Child and indicated the calls were "purposeless" because Father listened to them. Even though Father and Stepmother have not promoted or fostered a relationship between Mother and Child, the telephone conversations between Mother and Child consisted mainly of Mother talking about herself and not asking questions about Child and Child's well-being, therefore Mother did not foster a relationship with Child either.

Maternal Grandparents have custodial rights with regards to Child pursuant to the September 14, 2011 Court Order under the family docket number F.C. 07-90783-C. Mother never communicated with Child via telephone while Child was in the care of Maternal Grandmother. Maternal Grandparents have maintained a relationship with Child as a result of their own custody action.

On January 11, 2013, Mother was arrested for driving with a suspended license. She was incarcerated and released on June 24, 2013 from the Butler County Prison, but was immediately transported to the State Parole Center until July 2, 2013. During that period of incarceration, Mother attempted to keep in contact with Child via letters, although they were sporadic and minimal. The first letter was written on April 15, 2013 and addressed to Child, but mailed to Maternal Grandmother's address. The second letter was written on May 22, 2013 and addressed to Child's maternal grandmother. Mother indicated that she did not send letters to Child at Father's residence out of fear that Father and Stepmother would not let Child see the letters even though there was no prohibition to do so. Both letters clearly indicate that Mother expresses love and advice to Child. On May 7, 2013,

Mother received a Mother's Day card signed by Child, which Maternal Grandmother assisted Child in preparing. Mother also sent gifts and toys to Maternal Grandmother's residence for Child. Mother has not provided Child with any emotional support other than the two letters she sent to Child at Maternal Grandmother's home.

In September of 2013, approximately two months after her release from the State Parole Center, Mother relapsed and overdosed on heroin. Mother appears to have stabilized since her September 2013 relapse in that she has suffered no further incarceration and has not reported further relapse in her recovery. Mother has maintained recovery, in part, by treating with Suboxone, as per Mother's own testimony. She tests monthly with her parole officer and has not recently had a positive drug test. It does not appear that Mother has taken any additional steps to treat her drug addiction. Mother provided no evidence that she participated in any rehabilitation service or therapy following her relapse. Other than testifying to taking some medications, Mother offered little testimony regarding the treatment/maintenance of her mental health.

. . . .

Mother testified that she has attempted to provide what limited support she can offer since she is unemployed, and offered to pay for Child's participation in Martial Arts; however, Father refused any financial assistance from Mother. Mother has not provided financial support in any substantive manner. Mother is unable to provide for Child's needs and welfare without assistance from a third party. Mother's life lacks stability.

Currently, Mother is residing with her friend. She takes medications for her borderline personality disorder and attention deficit hyperactivity disorder. She also attends weekly therapy in Sewickley as well as church. It is not clear to the Court whether

- 6 -

> Mother is working or what her source of income may
> be.

Trial court opinion, 3/5/15 at 8-15 (footnotes omitted).

We have condensed the procedural history as follows. Initially, Father filed a petition for involuntary termination of Mother's parental rights on May 29, 2011. However, Mother and Father reached an agreement pursuant to a concurrent custody action in family court whereby Mother enjoyed therapeutic visits with Child. Pursuant to the agreement, Father withdrew the petition. During the next two years, multiple petitions seeking custody modification and special relief were filed by both parties. Father filed another petition for involuntary termination of Mother's parental rights on June 20, 2013. On July 1, 2013, counsel was appointed for Child. Following several continuances, hearings on Father's petition were held on July 7-8, and August 4-5, 2014. Prior to the start of the hearings, a petition for adoption of Child was filed on July 3, 2014, by A.M.D., wife of Father. (Docket #124.) On December 22, 2014, the trial court entered an opinion and order terminating Mother's parental rights. On January 16, 2015, Mother filed her notice of appeal along with a concise statement of errors complained of, pursuant to Pa.R.A.P. 1925(a)(2)(i) and (b). On March 5, 2015, the trial court issued its Rule 1925(a) opinion.

Mother now presents the following claims for our review:

> I. Whether the evidence in the record is inadequate for the trial court to have concluded, by clear and convincing evidence,

> that grounds for involuntary termination of parental rights existed pursuant to 23 Pa.C.S.A. § 2511(a)(2)[?]
>
> II.  Whether the evidence in the record is inadequate for the trial court to have concluded that termination of parental rights was in the best interests of the child, as required by 23 Pa.C.S.A. § 2511(b)[?]
>
> III.  Whether the trial court's failure to admit and consider competent evidence constituted an abuse of discretion[?]

Mother's brief at 2.

We review an appeal from the termination of parental rights in accordance with the following standard.

> [A]ppellate courts must apply an abuse of discretion standard when considering a trial court's determination of a petition for termination of parental rights. As in dependency cases, our standard of review requires an appellate court to accept the findings of fact and credibility determinations of the trial court if they are supported by the record. *In re: R.J.T.*, 608 Pa. 9, 9 A.3d 1179, 1190 (Pa. 2010). If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. *Id.*; [*In re*] *R.I.S.*, 36 A.3d 567[, 572 (Pa. 2011) (plurality opinion)]. As has been often stated, an abuse of discretion does not result merely because the reviewing court might have reached a different conclusion. *Id.*; *see also Samuel Bassett v. Kia Motors America, Inc.*, 613 Pa. 371[, 455], 34 A.3d 1, 51 (Pa. 2011); *Christianson v. Ely*, 838 A.2d 630, 634 (Pa. 2003). Instead, a decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. *Id.*

> As we discussed in **R.J.T.**, there are clear reasons for applying an abuse of discretion standard of review in these cases. We observed that, unlike trial courts, appellate courts are not equipped to make the fact-specific determinations on a cold record, where the trial judges are observing the parties during the relevant hearing and often presiding over numerous other hearings regarding the child and parents. **R.J.T.**, 9 A.3d at 1190. Therefore, even where the facts could support an opposite result, as is often the case in dependency and termination cases, an appellate court must resist the urge to second guess the trial court and impose its own credibility determinations and judgment; instead we must defer to the trial judges so long as the factual findings are supported by the record and the court's legal conclusions are not the result of an error of law or an abuse of discretion. **In re Adoption of Atencio**, 650 A.2d 1064, 1066 (Pa. 1994).

**In re Adoption of S.P.**, 47 A.3d 817, 826-827 (Pa. 2012).

The burden is upon the petitioner to prove by clear and convincing evidence that the asserted grounds for seeking the termination of parental rights are valid. **In re R.N.J.**, 985 A.2d 273, 276 (Pa.Super. 2009).

> The standard of clear and convincing evidence is defined as testimony that is so "clear, direct, weighty and convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue."

**Id.**, quoting **In re J.L.C.**, 837 A.2d 1247, 1251 (Pa.Super. 2003).

Here, the trial court terminated Mother's parental rights based on Section 2511(a)(2) and (b), which provide as follows:

### § 2511. Grounds for involuntary termination

**(a)** **General rule.--**The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

. . . .

(2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

. . . .

**(b)** **Other considerations.--**The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S.A. § 2511(a)(2), (b).

In order to terminate parental rights pursuant to 23 Pa.C.S.A. § 2511(a)(2), three elements must be met:

> (1) repeated and continued incapacity, abuse, neglect or refusal; (2) such incapacity, abuse, neglect or refusal has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being; and (3) the causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied.

*In re Adoption of M.E.P.*, 825 A.2d 1266, 1272 (Pa.Super. 2003) (citations omitted).

Our supreme court addressed incapacity sufficient for termination under Section 2511(a)(2).

> A decision to terminate parental rights, never to be made lightly or without a sense of compassion for the parent, can seldom be more difficult than when termination is based on incapacity. The legislature, however, in enacting the 1970 Adoption Act, concluded that a parent who is incapable of performing parental duties is just as parentally unfit as one who refuses to perform the duties.

*In re Adoption of S.P.*, 47 A.3d at 827 (citations omitted).

After a careful review of the record, we cannot grant Mother relief on her claim that the evidence was insufficient to terminate her parental rights under Section 2511(a)(2). We adopt the trial court's discussion of Section 2511(a)(2) as this court's own. (*See* trial court opinions, 12/22/14 at 15-17 and 3/5/15 at 17.) The clear and convincing evidence of record confirms the trial court's determination that Mother has been unable to remedy her drug addiction and mental health issues that create her repeated and continuing incapacity to parent, and that Mother has been, and

continues to be, unable to provide proper care for Child, warranting the termination of her parental rights pursuant to 23 Pa.C.S.A. § 2511(a)(2).

After we determine that the requirements of Section 2511(a) are satisfied, we proceed to review whether the requirements of Section 2511(b) are satisfied. *See In re Adoption of C.L.G.*, 956 A.2d 999, 1009 (Pa.Super. 2008) (*en banc*). This court has stated that the focus in terminating parental rights is on the parent under Section 2511(a), whereas the focus in Section 2511(b) is on the child. *Id.* at 1008.

In reviewing the evidence in support of termination under Section 2511(b), we consider whether termination of parental rights would best serve the developmental, physical, and emotional needs and welfare of the child. *See In re C.M.S.*, 884 A.2d 1284, 1286-1287 (Pa.Super. 2005), *appeal denied sub nom. C.M.S. v. D.E.H., Jr.*, 897 A.2d 1183 (Pa. 2006). "Intangibles such as love, comfort, security, and stability are involved in the inquiry into the needs and welfare of the child. The court must also discern the nature and status of the parent-child bond, with utmost attention to the effect on the child of permanently severing that bond." *Id.* at 1287 (citation omitted).

The extent of the bond-effect analysis necessarily depends upon the unique facts and circumstances of the particular case. *In re K.Z.S.*, 946 A.2d 753, 763 (Pa.Super. 2008). Moreover, the mere existence of an

emotional bond does not preclude the termination of parental rights. *Id.* at 764.

In *In re Z.P.*, 994 A.2d 1108 (Pa.Super. 2010), we stated:

> "Above all else . . . adequate consideration must be given to the needs and welfare of the child." A parent's own feelings of love and affection for a child, alone, do not prevent termination of parental rights.
>
> Before granting a petition to terminate parental rights, it is imperative that a trial court carefully consider the **intangible** dimension of the needs and welfare of a child -- the love, comfort, security, and closeness -- entailed in a parent-child relationship, as well as the tangible dimension. Continuity of relationships is also important to a child, for whom severance of close parental ties is usually extremely painful. The trial court, in considering what situation would best serve the child[ren]'s needs and welfare, must examine the status of the natural parental bond to consider whether terminating the natural parents' rights would destroy something in existence that is necessary and beneficial.

*Id.* at 1121 (citations omitted) (emphasis in original).

Mother argues the trial court ignored the evidence provided by the court-appointed expert, Dr. Bernstein, that she had a strong bond with Child. Additionally, Mother contends the trial court erroneously relied on Father's expert, Dr. Chambers, who reviewed Dr. Bernstein's report and criticized the methodology used. (Mother's brief at 18.) Mother points out Father placed no evidence on the record to argue that a bond did not exist. (*Id.*)

Regarding Dr. Bernstein's and Dr. Chambers' conclusions, the trial court found the following:

> Bonding assessments were conducted by Dr. Bernstein. He found that Child was resilient enough to handle the periods of time when Mother was removed from Child's life due to her substance abuse problems, but he was unable to conclude if Child would be equally resilient whether the Court chooses to terminate or not terminate the rights of Mother. He was also unable to conclude whether one of the results would more negatively affect Child than the other. Dr. Bernstein opined that a bond still existed between Mother and Child, that there was a shared connection between Mother and Child, and it was more than an acquaintance. However, Dr. Bernstein opined that to determine the depth of the bond, it would require speculation of facts that do not exist. Dr. Bernstein was unable to determine what, if any, long-term effects terminating Mother's parental rights would have on Child. Dr. Bernstein opined that the Court not move forward with the termination of Mother's parental rights and that Mother and Child, as soon as possible, participate in a therapeutic-like opportunity to help them rebuild the bond, and to help Mother gain the trust that is necessary for Child to develop [in] knowing that she is committed to being a part of his life.
>
> Dr. Chambers reviewed Dr. Bernstein's report and any other collateral information that Dr. Bernstein used in reaching his opinions. It was Dr. Chamber's position that the methods employed by Dr. Bernstein during the bonding assessments were "flawed" and "disconnected."

Trial court opinion, 3/5/15 at 13-14 (footnote omitted).

Instantly, Child is eight years old. As an eight-year-old child, he undoubtedly knows Mother and has developed some type of emotional bond with her. However, the mere existence of an emotional bond does not

preclude the termination of parental rights. **See In re T.D.**, 949 A.2d 910 (Pa.Super. 2008) (trial court's decision to terminate parental rights was affirmed where court balanced strong emotional bond against parents' inability to serve needs of child).

As we explained in **In re A.S.**, 11 A.3d 473, 483 (Pa.Super. 2010)

> [I]n addition to a bond examination, the trial court can equally emphasize the safety needs of the child, and should also consider the intangibles, such as the love, comfort, security, and stability the child might have with the foster parent. Additionally, this Court stated that the trial court should consider the importance of continuity of relationships and whether any existing parent-child bond can be severed without detrimental effects on the child.

While **In re A.S.** discusses a foster parent, the court's analysis applies to the matter before us. Additionally, a significant aspect in this case is that Child enjoys the intangibles of love, comfort, security, and stability while in the custody of Father and step-mother. Based upon Mother's difficulties with drug addiction, mental health issues and the law, her relationship with Child lacks security, stability, and safety. Moreover, as discussed below, the trial court found that the severance of Mother's bond with Child would not have a harmful effect on Child. According to the trial court,

> In considering the totality of the evidence, months have passed with mother having minimal contact with Child. There is no credible evidence that Child has suffered or exhibited any loss or trauma as a result of not spending time with Mother. . . . The clear and convincing facts support that Mother and Child's bond is not "necessary and beneficial" and that Child's resiliency would have a

> positive impact on how he is affected by the termination of Mother's parental rights.
>
> So, while Child may have fun with Mother during their visits and enjoy the time spent, even looking forward to another time together in the future, there was no evidence that Child turns to Mother for comfort or direction. Therefore, the Court concludes that terminating Mother's rights would be, for Child, a minimal loss primarily because Mother's involvement with Child has been sporadic throughout his life. Mother was not parenting in any way from December of 2012 to the hearing. The instability of Mother's life, which causes her relationship with Child to be unstable, poses significant risk factors for Child. Considering Child's developmental, physical and emotional needs, the evidence supports that terminating Mother's parental rights meets the needs and welfare of Child.

Trial court opinion, 12/22/14 at 22.

Although Mother's love for Child is not in question, along with her desire for an opportunity to serve as Child's mother, a parent's own feelings of love and affection for a child, alone, will not preclude termination of parental rights. *See In re Z.P.*, 994 A.2d at 1121. A child's life "simply cannot be put on hold in the hope that [a parent] will summon the ability to handle the responsibilities of parenting." *In re Z.S.W.*, 946 A.2d 726, 732 (Pa. 2008) (citations omitted). Rather, "a parent's basic constitutional right to the custody and rearing of his child is converted, upon the failure to fulfill his or her parental duties, to the child's right to have proper parenting and fulfillment of his or her potential in a permanent, healthy, safe

environment." ***In re B., N.M.***, 856 A.2d 847, 856 (Pa.Super. 2004) (citation omitted).

Instantly, the trial court found that Mother has not provided for Child's developmental, physical, and emotional needs and welfare, and will not be able to provide for Child's needs, particularly because of the instability in Mother's life. As there is competent evidence in the record that supports the trial court's credibility and weight assessments regarding Child's needs and welfare, we conclude the trial court did not abuse its discretion as to Section 2511(b).

Last, Mother argues the trial court abused its discretion in failing to admit the reports of two witnesses. This issue is waived as Mother failed to include it in her Rule 1925(b) statement. ***See In re G.D.***, 61 A.3d 1031, 1036 n.3 (Pa.Super. 2013) (any issues not raised in the Rule 1925(b) statement are waived on appeal).

Accordingly, we affirm the order of the trial court terminating Mother's parental rights to Child.

Order affirmed.

Strassburger, J. joins the Memorandum.

Donohue, J. files a Concurring Memorandum.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 8/26/2015

# IN THE COURT OF COMMON PLEAS OF BUTLER COUNTY, PENNSYLVANIA
## ORPHANS' COURT DIVISION

IN RE:

                                    :       **O.A. No. 35 of 2011**

       X███ P. D███                :

                                      :

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

## PROCEDURAL HISTORY, FINDINGS OF FACT AND ORDER OF COURT

## PROCEDURAL HISTORY

X███ P. D███ (Hereinafter, "Child") was born January 25, 2007 to K███ K███ (Hereinafter, "Mother") and J███ D███ (Hereinafter, "Father"). The instant matter before the Court is Father's Petition for Involuntary Termination of Parental Rights of Mother filed June 20, 2013. Father initially filed a Petition to Involuntarily Terminate Parental Rights of Mother on May 19, 2011, however, Mother and Father reached an agreement pursuant to a concurrent action at the family court docket whereby Mother enjoyed therapeutic visits with Child. Pursuant to the agreement, Father withdrew the Petition on March 7, 2012.

Sometime in 2007, Father filed a Complaint for Custody at family court docket number 07-90783-C. Initially Mother was given primary custody and Father had partial physical custody pursuant to the recommendation of the Butler County Custody Conciliator. A review conference was scheduled for and held on July 29, 2008. Father appeared at the conciliation represented by counsel. Mother was incarcerated on that date, and thus did not appear at the conciliation, nor did counsel on her behalf. An Order of Court was entered on August 4, 2008 granting Father sole physical custody of Child until such time as Mother was released from incarceration and petitioned the Court for parenting time.

Over two and a half years later, on March 23, 2011, Mother filed a Pro Se Petition for Modification of a Custody Order. In May of 2011 Father filed an Answer and New Matter, as well as the initial Petition to terminate Mother's parental rights. A custody conciliation was conducted on May 24, 2011 where both parents participated and were represented by counsel. The parties agreed for Mother to begin therapeutic supervised partial custody, and a review conference was scheduled for August 25, 2011.

At the review conference, once again the parties agreed for Father to continue to have primary physical custody and mother to have therapeutic supervised visits. Another review conference was scheduled for November 21, 2011. Subsequently, an Order of Court was issued on December 5, 2011 setting forth among other things that Father have primary physical custody and Mother have supervised partial custody gradually moving toward monitored partial custody (monitored by Mother's family) and referring the custody matter to a Special Master for a hearing pursuant to Butler County local rule.

A hearing was held on June 19, 2012 and recommendations made to the Court. An Order of Court was issued July 30, 2012 granting among other things shared legal custody, Father to maintain primary physical custody with Mother maintaining monitored custody at Maternal Grandfather's home and gradually increasing that parenting time ultimately to alternating weekends without monitor or supervision.

On November 8, 2012 Father filed in the regularly scheduled Motion's Court a Petition for Special Relief. A hearing was scheduled for January 2, 2013. It further required Mother to exercise her overnight parenting time at Maternal Grandfather's home.

On or about December 17, 2012 Father filed an Emergency Petition for Contempt and Special Relief. An Interim Order of Court issued granting Father's request that Child be

returned to his custody, suspending Mother's partial physical custody and consolidating the matter to be heard with Father's previously filed Petition on January 2, 2013.

By consent of the parties and their counsel, that hearing was continued to March 18, 2013, but Mother's partial physical custody remained suspended. Due to a scheduling conflict, upon the Court's own Order the hearing was continued to May 17, 2013. On May 17, 2013, neither Mother nor her counsel appeared, and the hearing was continued until September 4, 2013.[1] The Court then moved the hearing up to August 27, 2013. On August 15, 2013 upon consideration of Mother's Motion to Continue and the consent of both parties, the hearing was continued to November 4, 2013. On or about October 31, 2013, this Court received a signed Consent Order of Court, endorsed by signature of both parties' counsel, to continue generally the hearing on both of Father's petitions.

On November 21, 2013, Father presented at the regularly scheduled Motion's Court a Petition to Confirm Legal Custody in Father or to Suspend Mother's Legal Custody. By Order of Court dated December 10, 2013, the Court consolidated the hearing on Father's Petition with the hearing on the involuntary termination of Mother's parental rights.

On May 19, 2011, Father filed an initial Petition for Involuntary Termination of Parental Rights. The hearing on that Petition was scheduled for June 15, 2011. Service of the Petition and Order scheduling the hearing were served on Mother on July 13, 2011. An Order of Court dated July 26, 2011 was issued appointing counsel to represent Mother in the Involuntary Termination matter. Preliminary Objections were filed on behalf of Mother on September 7, 2011, requesting the matter be dismissed. An Order of Court dated

---

[1] The hearing was scheduled and neither Mother nor Counsel on Mother's behalf appeared. Counsel for Mother was on vacation during the date of the scheduled hearing and Mother had not received notification of the date of the hearing due to her incarceration. Counsel for Mother had the wrong date in his records and therefore did not make arrangements for it to be covered while he was on vacation.

3

September 22, 2011 was issued appointing Counsel to represent Child in the Involuntary Termination matter. A Consent Order of Court dated September 23, 2011 continued the hearing on the Petition for Involuntary Termination of Mother's Parental Rights and a Pre-hearing conference was scheduled for January 10, 2012. The hearing on the Petition and Preliminary Objections was rescheduled for February 8, 2012. The Court, by its own Motion, rescheduled the hearing for March 9, 2012. A Consent Order of Court dated March 6, 2012 was issued granting the parties' requests to withdraw the Termination Petition, without prejudice, and cancel the March 9, 2012 hearing.

On June 20, 2013, Father filed another Petition for Involuntary Termination of Mother's Parental Rights, which was assigned a new docket number of O.A. 20 of 2013 due to the fact that Child's last name changed from K████ to D████. Father's petition asserted that Mother was not on time for the visitations and was using drugs again. A Motion to Merge and Consolidate Cases was filed by Father on August 22, 2013, which was subsequently granted, and thereby merging O.A. 20 of 2013 with O.A. 35 of 2011, the matter which is now before the Court. Mother was served personally with the Petition for Involuntary Termination as well as an Act 101 notice while incarcerated at the Butler County Prison on June 21, 2013.

Once the case was consolidated at O.A. 35 of 2011, the case proceeded as follows: An Order of Court dated July 1, 2013 was issued appointing Counsel for Child. The hearing on the Petition was scheduled for September 30, 2013. Mother's counsel was appointed by Order of Court on September 3, 2013. Through consent of the parties, the hearing scheduled for September 26, 2013 was continued for October 22, 2013. On October 22, 2013, an Order of Court was issued continuing the hearing for the 11th day of December,

4

2013. On November 13, 2013, by the Court's own Motion, the hearing was rescheduled for the 10th day of December, 2013. A Consent Order of Court, dated December 4, 2013, was issued granting a continuance of the hearing due to a scheduling conflict.[2] The hearing was rescheduled for February 7, 2014.

On December 10, 2013, immediately prior to the start of the hearing, Mother's counsel presented the Court with a Motion for Bonding Assessment between Mother and Child. The Court granted Mother's motion and allowed the parties ten days to present the Court with either the name of the agreed-to expert for the assessment or, if no expert is agreed to, with a name of their requested assessor for the Court to decide. On January 15, 2014, due to the inability of the parties to reach an agreement, the Court issued an Order naming Dr. Eric Bernstein as the bonding assessment expert to be utilized. Father's Petition to Confirm Legal Custody on Father or Suspend Mother's Legal Custody was consolidated with the Termination hearing.

On January 14, 2014, the Hearing on the Termination Petition and Father's Petition to Confirm Legal Custody was rescheduled from February 7, 2014 until March 10, 2014 due to the still pending bonding assessment. On February 27, 2014, an Emergency Motion to Continue and for Special Relief—Obtain Additional Assessment was presented to the Court on Father's behalf. Father received Dr. Bernstein's report on February 19, 2014. Upon review of the report, Father wanted an additional assessment to be completed.

---

[2] Mother's attorney in the Orphan's Court matter wished to present a Motion for Bonding Assessment between Mother and Child during the November 21, 2013 Motion's Court. Father's custody attorneys wished to present a Motion at the same Motions Court to confirm legal Custody in Father or to Suspend Mother's Legal Custody. Mother's custody attorney had a conflict with the November 21, 2013 Motions Court date and was unable to attend to defend Mother's position against Father's Motion. Due to the holidays, no other Motions Court was scheduled prior to the scheduled hearing on the Petition for Involuntary Termination. Therefore, the Court utilized the December 10, 2013 date to hear the Motions of the parties that were unable to be presented at the November 21, 2013 Motions Court.

Father's counsel notified Mother's counsel of the request for continuance and additional assessment, to which Mother would not consent.

Prior to the Termination Hearing, the issue of an evaluation of a bond between Mother and Child was discussed in Chambers between Mother's counsel and Father's counsel. At that time, Father's counsel did not believe an evaluation was necessary, but Mother's counsel did. Mother's counsel asked the Court's permission to allow Child to undergo evaluations by Dr. Bernstein. Thereafter, Father's counsel requested a separate evaluation to be completed by Dr. Chambers. The Court issued an Order on April 10, 2014 denying Father's request for an additional bonding assessment as it did not want the child to undergo a second and separate set of evaluations. The Court did allow Dr. Chambers to review the report made by Dr. Bernstein and testify as an expert witness on Father's behalf. The Court granted the request for a continuance in the same Order. The Hearing was continued from March 10, 2014 to July 7 and 8, 2014.

An Order of Court was issued on June 11, 2014 granting Mother's request for an additional trial date to allow time for Dr. Bernstein to testify since he was unavailable for the July dates. Dr. Bernstein was scheduled to testify on August 4, 2014. The morning of the third day of the Termination Hearing, Father's counsel presented a Motion in Limine to prohibit Mother's expert from testifying. The Motion was denied by the Court.

The Thursday prior to the Termination Hearing, Counsel for Father presented a Motion in Motions Court requesting testimony of Father's pastor to be allowed. Due to a conflict in that the judge presiding over the Termination Hearing attends the pastor's church; another judge was assigned by Court Administration to hear the arguments. On the morning of the first day of trial, the parties presented their arguments in front of that

assigned judge. On the fourth day of the Termination Hearing, the judge ruled on the Motion and prohibited the pastor's testimony.

A four day hearing was held on the consolidated matters of Father's Petition to Involuntarily Terminate Mother's Parental Rights at O.A. number 35 of 2011 and Father's Petition to Suspend Mother's Legal Custody[3] at FC-07-90783-C. Both parties were present for the hearing and represented by Counsel. Counsel for Child was also present.[4]

## FINDINGS OF FACT

Mother and Father never married. At the time of Child's birth, they resided together. Both consumed illegal drugs. Child was born addicted to methadone. During this time, both parents provided care for Child. When Child was three or four months old, Father left Mother who then provided all parental care for Child until her arrest on or about July 16, 2008 when Child was approximately 18 months old.

Mother was purchasing stamp bags of heroin. Child was present. Mother was charged with endangering the welfare of a child, possession of a controlled substance, and distribution of a small amount of marijuana. Mother ultimately pled guilty to all three charges.

After breaking up with Mother, Father began a process to stop his drug use. In July of 2007, Father enrolled in rehabilitation at Turning Point. He continued his plan for sobriety by attending Gateway, participating in Narcotics Anonymous for one year and participating in counseling through his church. Father has a clean date of August 9, 2007.

Following Mother's arrest, Child was temporarily placed with Maternal Grandfather. Mother remained incarcerated for approximately three weeks. Father learned

---

[3] There is not an Order of Court at the family docket ever providing for Father to have sole legal custody prior to the filing of Father's Petition.

[4] Counsel for Child was appointed only for the Orphan's Court matter.

of Mother's incarceration and placement of Child with Maternal Grandfather at a previously scheduled Custody Conciliation conference. Thirteen days after Mother's arrest, physical custody was then granted to Father. Father has remained the primary physical custodian of Child since.

From the date of her arrest on July 16, 2008 until the start of therapeutic visits sometime the in the summer of 2011, Mother had little contact with Child, provided no parental care, and provided no financial support for Child. Father provided all parental care and emotional support for Child. Prior to 2011, Mother had a long history of drug abuse and criminal convictions for drug related matters. Mother testified she has a diagnosis of borderline personality disorder. Mother has been prescribed medication such as Klonopin and Adderall for anxiety and ADHD. It is not clear from the evidence whether Mother has officially had a mental health evaluation, nor is it clear what prescriptions, if any, Mother is currently prescribed. Mother testified that she addresses her mental health by taking medication, attending weekly therapy and attending church.

Mother spent some time in 2010 in a state correctional facility followed by a day reporting program and a half-way house. It was during this time, with Father's consent and support by Maternal Grandfather, that Mother had limited contact with Child.

Sometime after her release from the half-way house, Mother filed for a modification of custody. Following a custody conciliation, Mother received therapeutic visits with Mr. Ken Evanoski at Family Pathways through a Court Order dated June 2, 2011.[5] Goals were set for Mother through Family Pathways which included being consistent with visitations, being prepared with snack, games and activities for Child during visits, and being able to show she was interested in Child. From the start, Mother did very well in that she would

---

[5] Admitted in evidence as Plaintiff's Exhibit 1.

8

always come to visits "prepared and provided plenty of stuff and food" for Child.[6] She would bring train sets and a little chair every week for Child. Mother signed releases to allow Family Pathways to communicate with her probation officer and other therapists. Due to the weekly drug screens Mother was submitting through her probation officer, she did not submit to drug screens at Family Pathways. She did, however, submit weekly reports with regards to her drug screens through her probation officer. Mother was passing her weekly tests.[7]

Mother and Child continued to visit at Family Pathways until sometime in December of 2011. Father unilaterally stopped the therapeutic visits. Father's explanation for ending the visits even though Court ordered varied from complaining that the location was inconvenient to disagreeing with the view of the therapeutic supervisor. Ken Evanoski testified that he has not been involved for more than two years with the parties, and has no knowledge of the current situation that exists.

Due to Father's refusal to take Child to Family Pathways, Mother missed some parenting time. However, Father "permitted" Mother to have parenting time at Maternal Grandfather's home instead.

Therefore, Mother and Child had regular consistent parenting time together from approximately May, 2011 until December, 2012 (18 months). Mother has not, however, had any significant parenting time with Child that was not at least monitored since prior to July 16, 2008. Mother's presence in Child's life has been sporadic as a result of her continued struggle with addiction and incarceration. In fact, Mother has not seen Child since December 18, 2012 other than for a bonding assessment session on February 17, 2014.

---

[6] Admitted in evidence as Defendant's Exhibit A.
[7] As testified by Mr. Ken Evanoski with Family Pathways.

In December of 2012, Mother proceeded to an appointment at a Suboxone clinic in Squirrel Hill during her scheduled four-hour visit with Child. She then kept Child for an additional four days, and she knowingly and intentionally failed to advise Father of Child's whereabouts during that period of time. This incident resulted in the suspension of Mother's visiting time with Child, which is still in effect. Mother testified that she believed Child to be too ill to return to Father's care and, therefore, sought medical treatment for Child and claimed Child exhibited symptoms of a fever, a runny nose, vomiting and sore throat. The Court did not find Mother credible as to the reason she failed to timely return Child to Father's custody. Upon being discharged from the health care provider, Mother received instructions to give Child Tylenol or ibuprofen as needed, to drink fluids, and rest. Nothing was placed on the record to confirm such medical treatment was sought. Since that incident in December of 2012, the only contact Mother has had with Child has been via telephone, the two letters Mother sent Child, and the one Mother's Day card Child sent Mother.

When the Court ordered, on or about December 17, 2012, that Mother's visitations be suspended, her contact with Child was limited to telephone contact. That Order of Court continues to be in effect due to the consented to continuation of the custody litigation under the family docket. Mother has called Child at Father's residence on a regular basis since the filing of the Petition despite the fact that Father listens to every conversation on speaker phone. The comfort level of the telephone communications may have been strained due to the monitoring of the communications by Father. During the telephone conversations, Mother did not engage in meaningful conversation with Child and indicated the calls were "purposeless" because Father listened to them. Mother never communicated with Child via telephone while Child was in the care of Maternal Grandmother. Father and Stepmother

10

have not promoted or fostered a relationship between Mother and Child. However, Maternal Grandparents have maintained a relationship with Child as a result of their own custody action.

On January 11, 2013, Mother was arrested for driving with a suspended license. She was incarcerated and released on June 24, 2013 from the Butler County Prison, but was immediately transported to the State Parole Center until July 2, 2013. During that period of incarceration, Mother attempted to keep in contact with Child via letters, although they were sporadic and minimal. The first letter was written on April 15, 2013 and addressed to Child, but mailed to Maternal Grandmother's address. The second letter was written on May 22, 2013 and addressed to Child's maternal grandmother. Mother indicated that she did not send letters to Child at Father's residence out of fear that Father and Stepmother would not let Child see the letters even though there was no prohibition to do so. Both letters clearly indicate that Mother expresses love and advice to Child. On May 7, 2013, Mother received a Mother's Day card signed by Child, which Maternal Grandmother assisted Child in preparing. Mother also sent gifts and toys to Maternal Grandmother's residence for Child. Mother has not provided Child with any emotional support other than the two letters she sent to Child at Maternal Grandmother's home.

In September of 2013, Mother relapsed and overdosed on heroin. Mother appears to have stabilized since her September 2013 relapse in that she has suffered no further incarceration and has not reported further relapse in her recovery. Mother has maintained recovery, in part, by treating with Suboxone, as per Mother's own testimony. She tests monthly with her parole officer and has not recently had a positive drug test. It does not appear that Mother has taken any additional steps to treat her drug addiction. Mother

11

provided no evidence that she participated in any rehabilitation service or therapy following her relapse. Other than testifying to taking some medications, Mother offered little testimony regarding the treatment/maintenance of her mental health.

Bonding assessments were conducted by Dr. Bernstein. He found that Child was resilient enough to handle the periods of time when Mother was removed from Child's life due to her substance abuse problems, but he was unable to conclude if Child would be equally resilient whether the Court chooses to terminate or not terminate the rights of Mother. He was also unable to conclude whether one of the results would more negatively affect Child than the other. Dr. Bernstein opined that a bond still existed between Mother and Child, that here was a shared connection between Mother and Child, and it was more than an acquaintance. However, Dr. Bernstein opined that to determine the depth of the bond, it would require speculation of facts that do not exist. Dr. Bernstein was unable to determine what, if any, long-term effects terminating Mother's parental rights would have on Child. Dr. Bernstein opined that the Court not move forward with the termination of Mother's parental rights and that Mother and Child, as soon as possible, participate in a therapeutic-like opportunity to help them rebuild the bond, and to help Mother gain the trust that is necessary for Child to develop in knowing that she is committed to being a part of his life.[8]

Dr. Chambers reviewed Dr. Bernstein's report and any other substantive information that Dr. Bernstein used in reaching his opinions. It was Dr. Chamber's position that the methods employed by Dr. Bernstein during the bonding assessments were "flawed" and "disconnected."

---

[8] Dr. Bernstein's testimony.

Mother testified that she has attempted to provide what limited support she can offer since she is unemployed, and offered to pay for Child's participation in Martial Arts; however, Father refused any financial assistance from Mother. Mother has not provided financial support in any substantive manner. Mother is unable to provide for Child's needs and welfare without assistance from a third party. Mother's life lacks stability.

Currently, Mother is residing with her friend. She takes medications for her borderline personality disorder and attention deficit hyperactivity disorder. She also attends weekly therapy in Sewickley as well as church. It is not clear to the Court whether Mother is working or what her source of income may be.

Child's needs and welfare are currently being met. He resides with Father, Stepmother and his three siblings. Child has a healthy bond with his stepbrother and half-sisters. Father is now married and has had two children with Stepmother. Father has remained sober. He owns a construction company and has operated the company since 2009. Father's office is located within their home.

Child knows that Mother is, in fact his biological mother and has affection for her, even though Child has not received any parenting from Mother since December of 2012. Mother has genuine love and affection for Child. Father, Stepmother, Maternal Grandmother, Paternal Grandfather and Maternal Aunt all clearly love Child.

## LEGAL STANDARD

The grounds for involuntary termination of parental rights are set forth in Section 2511(a), Title 23 of Pennsylvania Consolidated Statutes which provides in pertinent part:

Grounds for Involuntary Termination

(a) General rule. The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

13

(1) The parent by conduct continuing for a period of at least six months immediately preceding the filing of the petition either has evidenced a settled purpose of relinquishing parental claim to a child or has refused or failed to perform parental duties.

(2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

. . .

(b) Other considerations. The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), the court shall not consider any efforts by the parents to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S.A. § 2511. The Pennsylvania Supreme Court has stated, "it is well-established that a court must examine the individual circumstances of each and every case and consider all explanations offered by the parent to determine if the evidence in light of the totality of the circumstances clearly warrants the involuntary termination." *In re E.D.M.*, 550 Pa. 595, 601, 708 A.2d 88, 91 (1998).

Once statutory grounds for termination of parental rights have been met, the Court must then consider whether termination serves the needs and welfare of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child. *In re C.L.F.*, 956 A.2d 999 (Pa. Super. 2008). In reviewing the nature and status of the emotional bond, the Court may consider any evidence relevant to the issue. *In re Adoption of R.J.S.*, 901 A.2d 502 (Pa. Super. 2006).

### LEGAL ANALYSIS

14

**The parent by conduct continuing for a period of at least six months immediately preceding the filing of the petition either has evidenced a settled purpose of relinquishing parental claim to a child or has refused or failed to perform parental duties.**

Since the Court is finding under 23 Pa.C.S.A. § 2511(a)(2) that Mother's parental rights should be terminated, the Court will not be addressing 23 Pa.C.S.A. §2511(a)(1).

**The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.**

Following a hearing on a termination petition, the Court must first determine whether the petitioner has proven by clear and convincing evidence at least one sub-section of 2511(a). Pursuant to section 2511(a)(2), the petitioner must prove: (1) a repeated and continued incapacity, abuse, neglect or refusal; (2) that such incapacity, abuse, neglect or refusal caused the child to be without essential parental care, control or subsistence; and (3) that the causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied. *See In Re Adoption of K.J.* 936 A.2d 1128, 1133 (Pa. Super. 2007).

Father proved that Mother has a repeated and continued incapacity due to her lack of proper treatment for her mental health diagnosis. Mother's testimony was scattered and disorganized. Mother asserts she is diagnosed with Borderline Personality Disorder and Adult ADHD. Mother's demeanor throughout the hearing was agitated, and she was often late for the hearing. Mother's explanation for not timely returning Child to Father's custody in December of 2012 was not credible, but it also demonstrated her inability to make decisions in the best interest of Child and her inability to appreciate the consequences of her decisions for herself and Child. Her rationales were not described in a way that demonstrated her cunning ability to purposefully withhold Child from Father, but rather an

15

irrational tale of acting out circumstances which had no basis in fact. While Mother testified that she has been prescribed Klonopin and Adderall, she provided no credible evidence as to whether she is currently prescribed those medications, properly taking those medications as prescribed, or under the current care of a psychiatrist or other medical professional. The Court recognizes that Father has the burden to prove Mother's incapacity and finds that he did. Mother provided no credible evidence to dispute Father's clear and convincing evidence.

Likewise, Father also proved that Mother has a repeated and continued incapacity due to her drug addiction. It is difficult to discern whether the unusual behavior Mother displayed prior to and after the filing of the Petition is the result of mental health issues or drug addiction. However, Mother's overdose of heroin in September of 2013 is clear and convincing evidence that, at least as of that date, Mother was still in addiction. Equally concerning is that since September of 2013 Mother has taken no further steps to address her addiction. The Court was not persuaded that, after years of addiction, Mother just simply "quit" on her own with her only source of support or therapy being her treatment with Suboxone. There was no credible evidence to support that Mother has a clean date. Similar to her mental health issues, Mother continues to battle her addiction.

Recognizing that Mother has a repeated and continued incapacity due to her mental health issues and drug addiction, the Court next considers whether those incapacities caused Child to be without essential parental care, control or subsistence. At the very least, due to Mother's drug addiction, she last provided parental care for Child without the supervision of Maternal Grandfather or some other third party in July of 2008. For the past six years Mother has either been unable to provide any parenting for Child or could do so only with

16

assistance. While Mother did very well during her therapeutic visitation with Child in 2011, this only lasted approximately six months, and the visits again were overseen by a third party in a controlled environment. For approximately one year, Mother did have parenting time with Child, but again, this was supervised and/or monitored by Maternal Grandfather.

As discussed *infra*, there is no credible evidence to show that Mother can or will remedy her mental health and addiction issues. The evidence shows that she has been a heroin addict since prior to Child's birth. Mother continues to be bound by these incapacities to a degree which prevents her from parenting. Especially in light of there being little to no evidence that Mother is currently addressing these issues much less making progress with them, there is clear and convincing evidence that the incapacities cannot or will not be remedied. The Superior Court in *In Re Adoption of K.J.*, acknowledges that "parents are required to make diligent efforts towards the reasonably prompt assumption of full parental responsibilities." *Id*. In the instant matter, Mother has taken no steps towards being able to independently parent Child since her heroin overdose in 2013.

Therefore, Father has proven by clear and convincing evidence the elements required pursuant to 23 Pa.C.S.A. § 2511(a)(2). The Court must now review the evidence in light of 23 Pa.C.S.A. § 2511(b) which states:

**Other considerations.** The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), the court shall not consider any efforts by the parents to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

17

This analysis is not the traditional "best interest" analysis common to custody and domestic relations matters. Rather, it uniquely evaluates whether the *termination* of a parent's parental rights meets the needs and welfare of the child. This is not a contest about who is the better parent, Mother or Father. At its core, the legal analysis does not consider as between two parents which better meets the "best interests" of the child. In fact, the statutory language is void of the term "best interest."

Rather, the focus is on the child and what impact, if any, terminating the parent's rights, and thereby the child's opportunity for continued relationship, has on the child. The Court should consider the whole child giving "primary consideration to the developmental, physical and emotional needs and welfare of the child." 23 Pa.C.S.A. § 2511(b).

"A parent's basic constitutional right to the custody and rearing of his or her child is converted, upon the failure to fulfill his or her parental duties, to the child's right to have proper parenting and fulfillment of [the child's] potential in a permanent, healthy, safe environment." *In re D.A.T.*, 91 A.3d 197, 207 (Pa. Super. 2014).

In the instant case, Father spent a plethora of the time presenting evidence as if this were a custody matter. The large majority of the evidence he presented was comparative in nature, that is, comparing the great life he can provide to Child compared to the life of instability he painted with Mother. The Court gave that evidence very little weight as it was irrelevant to the analysis required under the statute.

In fact, until ordered to do so pursuant to Mother's request, Father completely ignored the significance of a bond between Mother and Child in choosing not to have a bonding assessment completed. Even throughout Father's testimony, he seemed to have no appreciation for the impact terminating Mother's rights would have on his own child, but

18

was more engaged in the combat and achieving an end result regardless of the consequences to Child.

This was further demonstrated during the pendency of the hearing and related custody matters when Father, without legal authority and in direct disobedience to an Order of Court, unilaterally terminated Mother's and Child's therapeutic visitation at Family Pathways. Fortunately for Father, Mother never filed a Petition for Contempt.

However, the statute and the case law are clear that the Court, in analyzing 2511(b), must consider whether there is a natural bond between parent and child, and if so, whether the bond is a positive or negative one, and finally, whether severing that bond meets the needs and welfare of the child.

> Before granting a petition to terminate parental rights, it is imperative that the trial court carefully consider the intangible dimension of the needs and welfare of a child— the love, comfort, security, and closeness—entailed in a parent-child relationship, as well as the tangible dimension. Continuity of relationships is also important to a child, for whom severance of close parental ties is usually extremely painful. The trial court, in considering what situation would best serve the child's needs and welfare, must examine the status of the natural parental bond to consider whether terminating the natural parents' rights would destroy something in existence that is necessary and beneficial.

*Id.* at 1134 (*citing In re C.S.* 761 A.2d 1197, 1202 (Pa. Super. 2000)).

In this case there is no dispute that, should Mother's parental rights be terminated, Child's tangible needs and welfare will continue to be met. However, considering Child's intangible needs and welfare, the question of whether Mother's parental rights should be terminated is highly disputed. Since the petitioner has the burden of proof to provide clear and convincing evidence that termination of Mother's parental rights would meet Child's needs and welfare, customarily it is the petitioner who provides evidence relevant to the

19

bond, if any, between respondent and Child, and when necessary, a bonding assessment. However, Father chose not to have a bonding assessment completed. Mother did request a bonding assessment.

The Court considered, in its analysis, the testimony of Mother's expert, Dr. Bernstein, and Dr. Chambers, Father's rebuttal expert. The Court found Dr. Berstein's opinion insightful. He confirmed that Mother and Child indeed have a bond. He observed the interactions between Mother and Child to be appropriate and positive. However, he was unable, to a reasonable degree of professional certainty, to determine the depth of that bond, in other words, that the bond is "necessary and beneficial." Dr. Bernstein formed his opinion based upon facts as of February 19, 2014. He opined that Mother and Child should participate in therapeutic counseling to "rebuild" their bond.

Dr. Bernstein recognized that Mother's behavior is cyclical and that "something is not working."[9] He believed the therapy would "pressure and encourage and facilitate the mother to try to understand the impact of her behaviors toward the child."[10] So, the real question becomes whether maintaining Mother's parental rights meets the Child's needs and welfare when Mother will need therapeutic sessions to "rebuild" her bond with Child and supervised visits are necessary to provide safety to Child.

In reviewing Dr. Bernstein's report and collateral sources, Dr. Chambers opined that the risk of relapse, unpredictability and instability of Mother's behaviors would create anxiety in Child in such a way that it is not in his best interest to continue his relationship with Mother. Dr. Chambers reported that Mother has a long history of anti-social and destructive behaviors and that, "in the field of dual diagnoses, those two exacerbate the

---

[9] Transcript p. 83.
[10] Id.

20

other."[11] Dr. Chambers went on to further state that someone who only had drug and alcohol problems would be at a lower risk of relapse over someone who has those problems as well as mental health diagnoses. The mental health diagnoses increases the risk of relapse in Mother.

Dr. Chambers pointed out that Mother and Child's time together has been fairly limited through the years and that it takes time to develop a strong bond. His opinion is that inconsistency and unpredictability in a parent creates anxiety in children and, here, Mother's behaviors are unpredictable and unstable. He opined that Child is at risk for anxiety due to Mother's unpredictability and instability, but also because of the risk of poor judgment in Mother when and if she is under the influence. Dr. Chambers stated that a parent who struggles with impulse control and poor decision-making because of mental-illness or drug and alcohol abuse, will be more prone to present inconsistent behaviors and inconsistent parenting behaviors and therefore is detrimental in achieving a bond.

In considering the totality of the evidence, months have passed with Mother having minimal contact with Child. There is no credible evidence that Child has suffered or exhibited any loss or trauma as a result of not spending time with Mother. In reviewing *In re D.A.T.*, the Court noted that, in that case, the mother "clearly love[d] her children" and the Court was "impressed that [Child] showed a bond with Mother despite never being in her care. The Court further noted that although Child recognizes Mother and will probably miss her to some degree, Mother is "unable to meet [Child's] overall psychological and physical needs on her own."[12] Likewise, in the present matter, as opined by both Dr.

---

[11] Dr. Chambers' testimony 8/4/2014.
[12] *D.A.T.* at 207.

21

Bernstein and Dr. Chambers, Mother is unable to meet Child's psychological and physical needs on her own. Therefore,

> [W]hile Child [] has a bond with Mother, it is of such a nature that severance would not cause Child undue dismay. Child's main sources of love, comfort, stability and security are with [Father], not Mother. Further, Mother is not able to meet Child's emotional, physical, and developmental needs, or to provide Child with a healthy, safe environment, and had not been able to do so for almost [6] years prior to the termination hearing.

*D.A.T.* at 208. The clear and convincing facts support that Mother and Child's bond is not "necessary and beneficial" and that Child's resiliency would have a positive impact on how he is affected by the termination of Mother's parental rights.

So, while Child may have fun with Mother during their visits and enjoy the time spent, even looking forward to another time together in the future, there was no evidence that Child turns to Mother for comfort or direction. Therefore, the Court concludes that terminating Mother's rights would be, for Child, a minimal loss primarily because Mother's involvement with Child has been sporadic throughout his life. Mother was not parenting in any way from December of 2012 to the hearing. The instability of Mother's life, which causes her relationship with Child to be unstable, poses significant risk factors for Child. Considering Child's developmental, physical and emotional needs, the evidence supports that terminating Mother's parental rights meets the needs and welfare of Child.

The Court considered Mother's argument that her bond with Child was diminished by Father's attempt to interfere with her visitation/parenting time. Father did impede Mother's potential progress by unilaterally terminating the visitations at Family Pathways. However, determining whether terminating Mother's parental rights meets Child's needs and welfare is not decided in a vacuum. Mother has a responsibility to build and promote a

22

strong and beneficial relationship with Child. Mother has a responsibility to meet the needs and welfare of Child. Father was ill advised in terminating the visitations at Family Pathways; however, Mother did not seek the redress of the Court to enforce her visitation rights, most probably due to the instability in her own life. The Court acknowledges that Mother can provide appropriate parenting to Child when she is sober and in a very controlled environment. The Court acknowledges that Mother loves Child very much and wants to provide for Child. However, to be successful, Mother needs a structured setting.

The result is that while Father did not promote a relationship between Mother and Child, he did not prevent it either. This was demonstrated by his agreement to have Mother visit Child at Maternal Grandfather's after he refused to take Child to Family Pathways. He did not prevent Mother from visiting with Child. When reviewing the time periods that Mother was either absent from or minimally involved in Child's life, the primary cause was Mother's drug addiction and/or mental health issues.

Mother also argued that Father interfered in her relationship with Child by speaking negatively about Mother to and in front of Child, and by encouraging Child to call Father's wife "Mom." Based upon Dr. Bernstein's testimony, Child appears to be resilient and well-adjusted. There was no evidence to support that Child had a negative view of Mother much less that such a view was promoted by Father.

However, the Court took note during trial that Father appears annoyed that he has to tolerate Mother's interference in his new life. The Court cannot truly know Father's motivation to terminate Mother's parental rights, nor is it relevant. Father has overcome many challenges in his life, and is to be respected and commended for his efforts. He has

worked hard to provide a moral and structured life for his son. It is understandable that he would be protective as well.

Mother's rights are not being terminated for Father's convenience. Mother loves Child deeply. The evidence clearly shows that Mother desires with her whole heart to be a daily parent to Child. Unfortunately, due to her mental health and drug addiction issues, she is unable to do so. This does not, however, diminish her love for Child.

Father's presentation of the evidence at trial focused on the "best interest" of Child, and blurred the facts so that at the conclusion of the evidence it did not appear that Father could have proven by clear and convincing evidence the elements of § 2511(a) or (b). However, upon reviewing the relevant facts and conducting a statutory analysis, this Court finds that Father did indeed provide clear and convincing evidence as to both § 2511(a) and (b). Therefore, the Court must conclude that Mother's parental rights be terminated.

Therefore, the Court enters the following:

*December 22, 2014*

NOTICE OF ENTRY OF ORDER/DECREE PURSUANT TO
PA. R.C.P. NO. 236

NOTIFICATION

THIS DOCUMENT HAS OFFICIALLY BEEN
ENTERED IN THIS CASE BY THE BUTLER
COUNTY CLERK OF ORPHANS' COURT ON

24

IN THE COURT OF COMMON PLEAS OF BULTER COUNTY,

PENNSYLVANIA, ORPHANS' COURT DIVISION

IN RE:  ADOPTION OF          :

                               :

XZAVIER DORNETTO         :       OA No. 35 of 2011

                               :

                               :

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

### DECREE OF TERMINATION OF PARENTAL RIGHTS

AND NOW, this 22 day of _Dec_, 2014, IT IS HEREBY ORDERED,

ADJUDGED, and DECREED that the Parental Rights and Duties of **KIMBERLY**

**KETTER** to **XZAVIER DORNETTO** be and are hereby terminated.

BY THE COURT:

_(signature)_

Kelley T.D. Streib, Judge

nlt

NOTICE OF ENTRY OF ORDER/DECREE PURSUANT TO
PA. R.C.P. NO. 236

NOTIFICATION

THIS DOCUMENT HAS OFFICIALLY BEEN
ENTERED IN THIS CASE BY THE BUTLER
COUNTY CLERK OF ORPHANS' COURT ON
December 22, 2014

25